Good morning, Your Honors. My name is Frank Say, and I represent the Petitioner. May I begin? Yes. Yes. This is an immigration case, which, as you take a look at the immigration judge's oral decision, which essentially was adopted by the Board of Immigration Appeals without its separate opinion, the entire discussion is about adverse credibility case, even though the... Can you wait just a second, Mr. Say? Would you stop the time? Can you make that beeping go away? It must be the phone lines still. Excellent. Thank you. Wait just one second. Ready? All right. May proceed. Thank you, Your Honors. This appeal involves the adverse credibility determination. And although the Petitioner has the burden of proof for any asylum claim or any relief that she requests, the adverse credibility can only be upheld if there's substantial evidence supporting it. Now, the court, the immigration court, provided five reasons why he deemed Petitioner's testimony not credible, her claim not credible. And I'll address each of those quickly and reserve some time for rebuttal. First, he starts off by indicating that the letter from the Petitioner's mother didn't provide enough sufficient details regarding her own, the mother's own arrest history with the Chinese government, as well as details about the Petitioner's arrest history. That criticism is totally unfounded because to say even... Ninth Circuit law is very clear. Even when an applicant's asylum application leaves some details open and her testimony in court is more detailed, the Ninth Circuit has held that that is not a basis to say that her testimony, therefore, is not credible. In this case, the immigration judge says your mother wrote a cover letter in which she submitted a police certificate and also a discharge letter from your employer and basically criticized that the cover letter that the mother wrote failed to list her own arrest record and also detail the daughter's arrest and persecution problems. And so that's clearly unreasonable for the immigration judge to demand. Why don't you jump ahead to the details about the beating with the police? That seemed to be the most significant one to the IJA. Would you mind going directly to that? Sure. I will be the first to admit that both the direct and the cross-examination in this issue was far from clear, was far from clear, because in the direct examination, her attorney begins by basically asking what happened and she testifies that she was hit in the eye and lost consciousness. Then the second question is what happened, what did this officer do next? And then she continues to say that he ordered me to, he told me to go back to the room and write a confession. So clearly there was either an unclear understanding of the question as to how long she was discussing when she said she lost consciousness or blacked out, because she clearly at some point regained consciousness. Now, whether that was momentary, whether that took a few moments, from that first question it was unclear what the meaning was, the questioner and the answerer. And then she was then asked what did the officer basically ask the second time, what did the woman officer do, the woman who hit you, what did she do? And the answer was sort of a very unclear, after I was hit in the eye, I don't know anything. And then she talks about three days later I was interrogated again. So clearly there was a disconnect between the time frame in which the questioner was asking the question and how she answered. Now, in cross-examination, it was also similarly not clear. There was one question, essentially one question from the government attorney asking her, pointing out to her, you testified earlier that you had blacked out, is that correct? And then she gave some answer. She didn't give a yes or no answer, but she gave an answer and then they moved on to the next question. Did you represent the Petitioner in the proceedings before the immigration judge? No, I did not. I also ---- You answered the question. Was there a lawyer that represented her before the immigration proceedings? The her ---- She had a yes or a no. I'm sorry, Your Honor. She changed lawyers at each step. She had a lawyer before the immigration judge. That's correct. Okay. Now, ordinarily, if there's a clarification necessary, she has a lawyer to make that clarification representing her. But you seem to draw inferences to the confusion when maybe that's as good as you're going to get because the lawyer doesn't want to ask any other questions. Well, Your Honor, under Ninth Circuit law regarding, I guess, conflicting testimony, in order for the judge to base the adverse credibility on that issue, the immigration judge has to, number one, provide an opportunity for clarification, and number two, in the oral decision, has to discuss why he or she believes that the explanation was not credible. The opportunity was there, the opportunity for cross-examination, correct? Hard to redirect examination. That's correct because, of course, there was a hearing, but the immigration judge has an independent responsibility to ask that question. To ask the question? That's correct. To ask the question, there appears to be... Or to point out the conflict. Point out the conflict and to provide an opportunity for her to clarify. Okay. The opportunity is to have her lawyer ask the question. Now, what does the immigration judge have to say? If the conflict is very apparent, does he have to say there's a conflict? The immigration judge has to say that there's a conflict and then has to give the applicant a chance in court, basically to point it out. Even though it's clear there is a conflict. That's correct. And there's reversible error, even though everyone knows there's a conflict, if he doesn't say there's a conflict. Those words have to be stated. Is reversible error when the immigration judge, in his or her decision, points to a conflict in which the immigration judge did not address? The answer is yes. Correct. You feel our law is that even though everybody in the room knows there's a conflict because it's obvious, the immigration judge has to say there is a conflict or there's automatic reversal of the... That's correct. And I could give an illustration from one of the Ninth Circuit cases. There's a, I know, more than one case, a Singh v. INS, where there was a question of how many times the person was police officers or government officials asked for a bride. Now, he only said one time, but his parents said there were two times in which they were asked for a bride. Now, there's a clear conflict there, but the problem was, and this was pointed out in the Ninth Circuit decision, it's possible that the second bride, the parents didn't inform the applicant. Right. But I think the difference, though, is that if you, if the Petitioner has an opportunity to respond in some fashion to the contradiction, then that satisfies the standard. Now, here you have a question on direct, a question on cross, redirect. Why doesn't that satisfy the standard? Because the government has put that episode at issue. Well, because the immigration judge in simply pointing out for the first time in the decision, that's insufficient. In fact, there are Ninth Circuit cases, say, when the Board of Immigration Appeals, when they take a look at a matter and they notice that there's a discrepancy to support an adverse credibility determination, if that's the first time that the Board of Immigration Appeals identified it, that case gets remanded because But that's a slightly different circumstance, I think. Judge Walz had a question. Go ahead. Let me ask one other question. The 21 months before she is told that she's fired, even though she's not getting paid all that time, the immigration judge questioned that. And we don't allow immigration judges to speculate, because they don't know how they run businesses. But on the other hand, we've said that immigration judges can use their common sense. And I haven't been able to delineate whether that's speculation or common sense. But here we have a situation where a person has not been working, has not been paid for 21 months, almost two years, and then there's a piece of evidence that says she's no longer working. The immigration judge says, that doesn't make any sense to me. Now, is that speculation or is that him using common sense, which he's allowed to use? I believe that's speculation. In her testimony, in her application, she indicated that after she was arrested, she was merely suspended from her employment. She wasn't terminated at that point. What proof did she offer that she was suspended and not terminated? Her testimony was it, Your Honor. And she said specifically, she used the word that I was suspended? That's correct. In her declaration. She indicates that she was suspended. The written declaration? Written declaration. Before the hearing? The written declaration was part of the asylum application. What did she say? I misunderstood that then, because I had understood at the hearing she said that she had been fired when she quit work. She got no more money and she couldn't apply for any other work because she had been fired from this first job. Right. I don't believe she said that she was fired immediately. And so obviously, by the time she came to hearing, at that point, she had the discharge letter and she had been fired. But she, in her application, she indicated that she was suspended. Your time has expired. Do you have any questions? No, no. Okay. Thank you. Thank you very much. Ms. Tyler. Good morning, Your Honors. My name is Julia Tyler and I represent the Attorney General of the United States in this immigration case. Your Honors, Respondent urges this Court to deny the petition for review because the adverse credibility determination in this case is supported by substantial evidence. The immigration judge's adverse credibility determination was supported by specific and cogent reasons, and those reasons bore a legitimate nexus to his decision. Your Honors, I'd like to jump immediately to the issues that you raised and specifically to discuss the bases for the immigration judge's decision in this case. First is one, is an issue that you raised with regard to the severity of the beating. Counsel, I want to zero in on that as well, because it seems to me that the essence of the description was the same every time. Every time she collapsed off the chair onto the floor, and it's variously described as feeling dizzy, blacking out, losing consciousness. But it's pretty clear from all of the descriptions that whichever one of those it is, and she's, you know, not a doctor, was pretty brief. I mean, she says, I felt dizzy, I blacked out, but I could still feel them hitting me. So why aren't those descriptions, although they use in translation a different word each time, why aren't they really describing the exact same thing? Well, Your Honor, I don't think they are consistent. Specifically during direct examination by her counsel, she was describing the incident, and she said, I was punched on my right eye and I lost consciousness. And fell from the chair. And I fell from the chair. And then on cross, she says, she hit my eye, they caught my hair, slapped my face. I fell off on the ground. Did you pass out or become unconscious? I feel dizzy, kind of blacked out, but I still feel they hit me. So... And this is at the record on page 77, after I was hit on the eyes, I don't know anything. She did not discuss being pulled up by her hair, she did not discuss being slapped in the face, she did not discuss any of that. But on cross-examination, she was directly confronted, and this is at the record of page 92, she describes being hit, feeling dizzy, being pulled on her hair, being slapped. And she is confronted by DHS counsel, earlier when your attorney asked you questions, I remember you said you passed out and you didn't know what happened after they hit your eye. She gave a very confusing answer to that confrontation question. And, Your Honor, I also want to raise an important issue with regard to Petitioner's remarks on this incident. She was directly confronted with this inconsistency, and then in addition to that, she was made aware of this inconsistency at the close of the hearing. Specifically, Ding's counsel called it an inadvertent discrepancy when DHS raised the issue, called the discrepancy troubling. He said it was an inadvertent discrepancy and said, well, we kind of went over that quickly. Your Honor, he was, she was represented by counsel, and she had an opportunity to clarify this and other issues that arose during the hearing. She took, this attorney chose not to rehabilitate her testimony, but to submit the case to the immigration judge. To add insult to injury, really, Your Honor, before the Board of Immigration Appeals, Ms. Ding did not raise any issue with regard to this inconsistency before the Board in her appeal. Then, for the first time before this Court, they raised the issue of a translation problem. There is absolutely no evidence in the record of any translation problem. Ms. Ding spoke Mandarin. She was given a Mandarin interpreter. There were no complaints during the course of the hearing that either one of them couldn't understand each other. And so there's just absolutely no evidence. And more importantly, at the end of the hearing when this inconsistency was raised, the attorney at that time, that would have been the best time to raise an issue with regard to translation, and none was raised. And what I'm hearing today, Your Honor, is that the questioning was unclear. I'm not hearing that there was a translation problem. I'm hearing yet another explanation for that very important inconsistency. But the IJ seemed to focus on the question of consciousness versus never losing consciousness. That seemed to be the linchpin of his argument on credibility. And here, I have to agree with Judge Graber, I just don't see much of a contradiction on that particular item in her testimony. She says blacked out and dizzy one time. I mean, it's obviously a very short event if there is one. Well, again, I think the critical exchange there is the fact that the first time she conveyed it, she said she was hit, lost consciousness, and didn't remember anything else happening after that. And then later she goes back and has some. But the IJ didn't seem to rely on that. I think the IJ relies. Your Honor, you know, again, I think this is a case where there are numerous inconsistencies, inconsistencies in her testimony, inconsistencies between her testimony and the documents she herself put at issue by submitting them to the court, and then again, issues with respect to the authentication of, or I should say the documents that she submitted and whether or not they were manufactured. If I could, I'd also like to go to the issue that Judge Wallace raised with regard to her termination from work, if I can clarify that at all. First, Ms. Ding did claim that she was suspended, she used the word suspended, and not allowed to work in April of 2000. This is after the police incident. She said that she received no pay and was told to meditate and confess at home. Now, this is interesting because in her asylum application, she wrote in her asylum application that she worked for the Seal Industry Company from 1995 to 2001. She was confronted with this discrepancy in the hearing, and she testified at the record at page 94 that she wrote that, that she'd been fired in 2001, because she was not officially fired until 2001. But in the very next sentence with DHS counsel, Ding testified that she was officially fired as of January 7, 2002, and she didn't know she was officially fired until she received a letter from her mother that was dated January 7, 2002. So we have a major inconsistency with regard to when she was terminated, when she was fired, when she knew she'd been fired. And Judge Wallace, you raise an excellent point with regard to the common sense that the immigration judge was applying here. She was confronted with the fact that the termination letter was issued 21 months after she'd been suspended and 11 months after she'd come to this country. In fact, her friend Zhang's letter reflects that the police and possibly her work were aware that she had left this country as early as February of 2001. Then the I.J. goes on to conclude that all of this was manufactured, that these documents were inauthentic. Well, I think that was ñ And that wasn't speculation. I do not believe it was speculation, Your Honor. And I think that the judge based that, based the manufacturing decision on three critical points. The first was that the documents had an indicia of not being authentic, and he goes into those details. He goes into detail, but he doesn't give any reason why, or evidentiary reason why he knows that those are indicia of unreliability. I mean, nobody just in this room probably knows from Pakistan or Guatemala or China what the correct government seal looks like. There has to be some basis in the record to explain what an authentic one looks like and why this is different. And I don't see that. Well, Your Honor, certainly the immigration judge found those documents questionable, but he did not base his entire decision with regard to the manufacturing of these documents on the fact that they just didn't look right. They were ñ Well, he bases it in part on that, and why is that okay? Well, Your Honor, I think the Supreme Court has expressly disapproved of sort of a divide-and-conquer approach to these decisions. And I think that when you look at all of the bases for this decision, and again, it was the indicia of inauthenticity, number one. Number two, the fact that she had used specifically fraudulent employment documents to gain entry into the United States through the U.S. consulate. That's number two. And number three, the inconsistency that she was provided a termination letter 21 months after she'd been told to stop work. None of that actually answered my question, which is whether there's any basis in the record for the conclusion that the documents were inauthentic because of the way they looked. He did not specifically state what it was in his experience and expertise that rose into that conclusion that they were ñ he did not ñ he did not expound. He didn't even say, I've examined 4,000 of these, and I know what they used to look like. He did not, Your Honor. That's true. But again, I think that is one prong of three that he based that manufacturing decision on. I see my time has expired. If I may briefly conclude. Sure. Thank you. Your Honors, this Court has wisely stated that the immigration judge is, by virtue of his acquired skill, uniquely qualified to determine whether an alien's testimony has about it the ring of truth. In light of all the record evidence in this case, the immigration judge concluded that repeated and significant inconsistencies in and between Ding's testimony and the documentary evidence in this case deprived her claim of the requisite ring of truth. The Petitioner failed to meet her burden of providing credible, specific, and direct evidence, and this Court should deny the petition for review because the evidence does not compel a contrary conclusion in this case. Thank you, counsel. Thank you. We'll give you 30 seconds. That's good because I have a question. Okay. I'd like to ask you about something that the government raised concerning the discussion we were having about whether or not your client lost consciousness or didn't. The government pointed out that that was not, that particular adverse credibility finding was not a basis of your appeal to the BIA. Do you agree or disagree with that statement as a factual matter? And if it is correct, what does that do to your argument here? I'd have to admit, Your Honor, I did not go through the BIA brief that thoroughly regarding how these were raised. Well, it's very generic. It just says that her testimony was plausible, consistent, and specific. And it doesn't, to my recollection, I'm summing through it, doesn't deal specifically with that issue about whether she lost consciousness or did not. And does that mean that the agency never had an opportunity to consider that particular claim and that we can't reach it? I don't think so, Your Honor. Your Honor, I mean, despite the appearance that the attorney who represented her before the BIA merely mailed in a brief, I guess when you describe it as being a generic response, the oral decision by the judge basically raised all the various issues. And by the BIA adopting the decision without its own opinion, I think basically all the issues are present. The government had the same, just as we did. The issues were all defined. We weren't raising an entirely new issue before the Ninth Circuit, Your Honor. Okay. Anything else you want to add? If I could just take 15 seconds to point out one point, one other discrepancy that the immigration judge raised, although neither of the courts, Your Honors, here pointed out, but there was a question regarding the letter from her friend. And the friend's name was Lan Feng Zhang, that last name being spelled Z-H-A-N-G. And this is perhaps, I admit, another issue of a new counsel coming in and spotting a different problem. The immigration judge pointed out that he asked the petitioner whether this friend was arrested at the time that you were arrested, in April 2000, and her answer was no. Now, the transcription actually spells her last name as G-H-A-N-G. And the prior counsel who briefed this issue pointed out that perhaps this was a typo or a clerical transcription. I would raise the question, and obviously I don't know, because I haven't actually listened to the tape. If the immigration judge actually mispronounced the last name in his question, that's a key problem. And this is another one of those problems where when the immigration judge spots an inconsistency, there's an obligation for the judge to actually confront the applicant on the record so that there could be an explanation. When was this issue first raised? Today, Your Honor. Pardon? I just spotted it today, Your Honor. Just today. Well, it was raised by her prior counsel in the briefs as a possible transcription error. Okay. But there's a burden to show the transcription error, and that isn't shown. It seems to me a little unfair to raise an issue at oral argument that hasn't been really identified, and we usually don't hear those arguments. Why should we give weight to this one? I point this out, again, Your Honor, simply to point out the Ninth Circuit rule that when there is an inconsistency, there is a reason behind the rule that the immigration judge needs to directly confront. But you're not saying this is an inconsistency. You're saying that he mispronounced a word. And he — that's correct. Yeah. Thank you. The case return will be submitted for decision. Proceed to the argument on the next case on the oral argument calendar, which is United States v. Croatia.
judges: Wallace, Thomas, Graber